## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEPHEN M. SILBERSTEIN,<br>29 Eucalyptus Road<br>Belvedere, CA  94920-2435<br><br>      Plaintiff,<br><br>      v.<br><br>U..S. SECURITIES AND EXCHANGE<br>COMMISSION<br>100 F Street, N.E.<br>Washington, D.C.  20549<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This is a civil action under the Administrative Procedure Act ("APA") challenging as arbitrary, capricious, and contrary to law the refusal of the U.S. Securities and Exchange Commission ("SEC") to initiate a rulemaking procedure to require public companies to disclose to shareholders and the public the use of corporate resources for political activities.

## JURISDICTION AND VENUE

2.  This Court has personal and subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 5 U.S.C. §§ 701, 702, and 706, and 28 U.S.C. § 2201.  The APA gives private parties the right to seek injunctive relief when adversely affected or aggrieved by agency action or inaction, 5 U.S.C. § 702, and empowers courts to compel agency action unlawfully withheld or unreasonably delayed. *Id.* at § 706.

3.  Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

4.  Plaintiff Stephen M. Silberstein has a longstanding interest in issues pertaining to corporate governance and responsibility.  He is an investor with a broad portfolio that includes shares in Aetna, Inc.  Mr. Silberstein has been an Aetna shareholder continuously since on or about July 1, 2003, and presently owns 2,108 shares of Aetna common stock, currently valued at over $230,172.  Mr. Silberstein brought a lawsuit against Aetna under § 14(a) of the Securities Exchange Act of 1934, as amended, based on the false and misleading statements in Aetna's 2012 and 2013 proxy statements made in opposition to shareholder proposals that would have required greater oversight of, and transparency in, Aetna's political contributions.

5.  Mr. Silberstein also filed a petition with the SEC along with a non-profit watchdog organization, Citizens for Responsibility and Ethics in Washington ("CREW"), seeking regulations from the SEC that would require publicly traded companies to disclose publicly their political contributions.  Without greater transparency in the political contributions of Aetna and other publicly traded companies in which Mr. Silberstein owns stock, Mr. Silberstein is harmed in fulfilling his shareholder duties, as he cannot determine whether those contributions are in the best interests of the companies.

6.  Defendant SEC is an agency within the meaning of 5 U.S.C. § 552(f) and was established by Congress to, *inter alia*, interpret and enforce federal securities laws, promote stability in the markets, and protect investors.

## STATUTORY AND REGULATORY BACKGROUND

7.  Section 14(a) of the Securities Act of 1934 specifies disclosure obligations to which all public companies are subject.  At the same time, Congress empowered the SEC to promulgate

"such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  Section 14(a), 15 U.S.C. § 78n(a).

8.  Courts have recognized the SEC's "powers to promulgate . . . rules requiring disclosure of information beyond that specifically required by statute."  *Natural Res. Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979).  Relying on this authority, the SEC has considered a number of additional disclosure requirements over the years.

**FACTS GIVING RISE TO PLAINTIFF'S CLAIM FOR RELIEF**

9.  The Supreme Court's 2010 decision in *Citizens United v. FEC*, 588 U.S. 310 (2010), freed companies to spend unlimited amounts of corporate funds on political activities on the theory such expenditures are protected political speech.  At the same time, the Supreme Court recognized disclosing such spending would allow shareholders to "determine whether their corporation's political speech advances the corporation's interest in making profits," *id.* at 370, thereby permitting shareholders "to react to the speech of corporate entities in a proper way."  *Id.* at 371.

10.  Although the Supreme Court has acknowledged the validity and utility of corporate disclosure requirements, the SEC has yet to propose regulations that would require public companies to disclose their political spending.

11.  Even before the Supreme Court's decision in *Citizens United*, shareholders increasingly were demanding greater disclosure of corporate political spending.  A 2006 poll revealed 85 percent of shareholders believed there was a lack of transparency in corporate political activity.  This concern with a lack of transparency was accompanied by a corresponding increase in shareholder proposals requesting disclosure of corporate political spending.  During

the 2011 proxy season, 25 percent of companies in the S&P 100 included proposals requesting disclosure of corporate political spending.

12. While this number has increased, the Center for Political Accountability's ("CPA") 2014 CPA-Zicklin Index notes 139 of the 299 companies included in the Index have never been engaged through a shareholder resolution on the issue of disclosing political spending.

13. Those demanding more corporate disclosure of political spending include some large institutional investors. A 2012 report from the Forum for Sustainable and Responsible Investment found between 2010 and 2012, disclosure of political spending was a top priority for institutional investors. For example, New York State Comptroller Thomas P. DiNapoli, sole trustee of the state's $160.7 billion pension fund, has demanded corporations disclose their political spending. In an April 2013 announcement of an agreement he reached with five companies to disclose political spending, Comptroller DiNapoli stated, "Shareholders have a right to know how companies are using corporate money for political purposes."

14. At the same time there has been a marked increase in the demand for disclosure of corporate political spending, the amount of political spending in general has reached extraordinary heights. According to the Center for Responsive Politics, in the 2012 presidential election cycle – the first since the *Citizens United* decision was handed down – total spending was nearly $6.3 billion, up from the nearly $5.3 billion spent in 2008.

15. This spending included anonymous or "dark" money, which has poured into our elections at an alarming rate. During the 2012 election cycle, groups that do not disclose their donors, including social welfare groups and trade association, spent $310.8 million, more than

four times the $69.2 million these same groups spent during the 2008 election cycle, and an increase of more than 5000 percent from the $5.8 million spent in 2003-2004.  In the 2014 non-presidential election cycle, these same groups spent $176.2 million.

16.  This trend is expected to continue, with political spending increasing exponentially. Spending for the 2016 presidential race currently is anticipated to be $5 billion, with the Koch Brothers alone committed to spending nearly $900 million on the race.

17.  Political spending by dark money groups has been aided, at least in part, by contributions from public corporations.  According to the 2014 CPA-Zicklin Index, which ranks political spending disclosure policies of the top 299 companies of the S&P 500, only nine percent of the companies analyzed stated under their policies they did not contribute in 2014 to social welfare groups exempt under § 501(c)(4) of the Tax Code, while only six percent stated they directed trade associations not to use their contributions on election-related activities.

18.  Although public companies are spending large amounts on election-related activities, they are not disclosing the contributions they make to dark money groups.  Just 24 percent of the companies analyzed by the CPA-Zicklin Index disclosed information about their contributions to § 501(c)(4) social welfare groups in 2014, down from 26 percent in the 2013 CPA-Zicklin Index.

19.  In 2012, the insurance giant Aetna, Inc., through a filing with the National Association of Insurance Commissioners, inadvertently revealed it had made more than $7 million in contributions to political groups, including more than $3.3 million to the politically active American Action Network, a § 501(c)(4) group, and over $4 million to the U.S. Chamber of Commerce.  Both groups aggressively opposed health care reform, which Aetna publicly claimed to support, and both groups spent millions of dollars to influence the 2012 elections. These payments for political activities were not disclosed through Aetna's widely touted

voluntary disclosure policy, angering shareholders and causing Aetna's accountability ranking on both the 2013 and the 2014 CPA-Zicklin Indexes to fall.

20.   When faced with shareholder proposals in 2012, 2013, and 2014 that would have required greater disclosure in and oversight of Aetna's political contributions, Aetna pointed to its political spending disclosure reports posted on the company's website as a reason why the proposals should be defeated.  Those political contribution reports, however, are riddled with inaccuracies, and fail to give a true and complete picture of Aetna's political contributions.

21.   Accordingly, Mr. Silberstein filed a lawsuit against Aetna, *Silberstein v. Aetna, Inc.*, Civ. No. 13-cv-8759 (S.D.N.Y.), for false and misleading proxy statements in violation of Section 14(a) of the Exchange Act and SEC regulations governing the content of proxy statements.  Mr. Silberstein's lawsuit was recently dismissed, leaving Mr. Silberstein no other avenue to hold Aetna accountable for the false claims it is making publicly about the robust disclosure policy it follows with respect to its political spending and the robust oversight of that spending performed by its Board of Directors.

22.   While increasing numbers of public companies are adopting voluntary political spending disclosure policies in response to shareholder pressure, an April 2014 study by CREW, *The Myth of Corporate Disclosure Exposed*, revealed that many of those companies are failing to meet their promises of transparency.  CREW's report identified three categories of problems with respect to corporate compliance with voluntary disclosure policies: (1) discrepancies between what companies disclosed in their reports of political contributions and what organizations receiving contributions from the companies reported to the Internal Revenue Service ("IRS"); (2) contradictions between companies' stated policies governing political contributions and their actual practices; and (3) confusing policies and reports.

23.  CREW uncovered significant discrepancies in 25 of the 60 companies examined between their corporate disclosure reports and contributions disclosed on tax forms filed by political groups organized under § 527 of the Tax Code.  For example, Microsoft's disclosure reports omitted nearly $1 million in contributions the company made to § 527 organizations between 2011 and 2013, despite the company's pledge to publicly disclose all contributions made in reports filed with the Federal Election Commission

24.  CREW also uncovered significant contradictions between stated company policies and contributions the companies made to § 527 organizations.  As one example, Ford Motor Company's policy asserts the company does not make contributions to political candidates or political organizations, when in fact in 2011 and 2013, Ford made contributions to at least five § 527 organizations totaling $200,399.

25.  The corporate disclosure policies of the companies examined in CREW's report also lacked uniformity and clarity.  For example, the corporate political spending policy of Wells Fargo states the company does not use corporate funds for candidate campaign funds, but a close reading reveals the restriction on contributions to § 527 organizations is limited to "electioneering activities," a distinction likely to elude those not well versed in campaign finance.

26.  For many companies, the corporate political spending information they make publicly available is difficult to access and use, especially in aggregate form.  Further complicating the picture, as CREW's report found, policies vary widely as to what each company reports and how they report it.

27.  On August 3, 2011, the Committee on Disclosure of Corporate Political Spending submitted a petition to the SEC seeking regulations requiring public companies to disclose to

shareholders the use of corporate resources for political activities, File No. 4-637.  This petition has garnered an unprecedented level of public support – at least one million comments in support as of September 4, 2014.

28.  Responding to the growing public interest in corporate political spending, the SEC's Division of Corporation Finance, as part of its 2013 regulatory agenda, announced it was considering "whether to recommend that the Commission issue a proposed rule to require that public companies provide disclosure to shareholders regarding the use of corporate resources for political activities."  This rule never materialized, however, and the Agency Rule List for the Fall of 2013 issued by the SEC omitted any reference to such rule.

29.  Given this inaction by the SEC, on May 8, 2014 – over one year ago and nearly four years since the submission of the 2011 Petition -- plaintiff Mr. Silberstein and CREW submitted an amended petition for rulemaking on disclosure by public companies of corporate resources used for

30.  Mr. Silberstein and CREW explained to the SEC their amended petition incorporated by reference the 2011 Petition, File No. 4-637, and was submitted to update the SEC on the ineffectiveness and limitations of political spending disclosure policies public companies have voluntarily adopted.  The petition explained this voluntary scheme has proven to be an ineffective substitute for a regulatory scheme that would impose a uniform disclosure regime on all public companies.  Leaving disclosure of corporate political spending to the discretion of individual companies has deprived investors, shareholders, and the public of information that would help them assess whether those contributions are in the best interest of these corporations and advance the interests of corporate democracy.

31. At the same time, as the amended petition explained, anonymous or "dark" money has poured into the electoral system in increasingly large amounts, including money from public corporations that have not disclosed to their shareholders the full extent of their political contributions.

32. Mr. Silberstein and CREW accordingly requested that the SEC initiate a rulemaking proceeding to require public companies to disclose to shareholders the use of corporate resources for political activities.

33. Notwithstanding the pendency of these two rulemaking petitions requesting that the SEC adopt a rule requiring public companies to disclose more fully the use of corporate resources for political activities, the SEC's Agency Rule List for the Fall of 2014, issued on November 21, 2014, continued to omit any reference to such rule.

34. To date, the SEC has given no indication it still is considering whether to recommend the issuance of such a proposed rule, nor has it otherwise responded to the pending rulemaking petitions.

## PLAINTIFF'S CLAIM FOR RELIEF

35. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

36. The legislative history of the APA makes clear agencies in receipt of rulemaking petitions must "fully and promptly consider them, take such action as may be required, and . . . notify the petitioner in case the request is denied." S. Rep. No. 752, 79th Cong., 1st Sess. (1945). Failure to respond to a rulemaking petition is subject to judicial review. *WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C. Cir. 1981).

37. The evidence is overwhelming that voluntary disclosure policies and practices by public companies are not working. At the same time, public companies and others are pouring massive amounts of dark money into our electoral system, allowing those companies to evade accountability to their shareholders for their actions.

38. In response to this evidence, there is nearly unprecedented public support for the promulgation of a rule by the SEC that would require public companies to disclose corporate resources used for political activities. This support is reflected in the extensive comments in support of rulemaking petitions filed with the SEC by the plaintiff and others that have been pending for years.

39. Notwithstanding this compelling evidence of the need for the SEC to engage in a rulemaking procedure and the overwhelming public support for such a rule, the SEC has refused to act or otherwise respond to the plaintiff's rulemaking petition, which incorporates a rulemaking petition filed in August 2011, nearly four years ago.

40. Defendant's effective denial of plaintiff's petition to initiate a rulemaking to require public companies to disclose corporate resources used for political activities is arbitrary, capricious, and contrary to law.

41. The failure of the SEC to provide a reasonable explanation, or any explanation at all, for its failure to grant plaintiff's rulemaking petition is arbitrary, capricious, and contrary to law.

42. Plaintiff is therefore entitled to relief in the form of a declaratory judgment that the SEC's refusal to grant the rulemaking petition and initiate a rulemaking to require public companies to disclose corporate resources used for political activities is arbitrary, capricious, and contrary to law.

43.  Plaintiff also is entitled to an injunction to compel defendant SEC to immediately initiate a rulemaking proceeding to require public companies to disclose corporate resources used for political activities.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court

(1) Declare defendant's refusal to grant plaintiff's petition for rulemaking to require public companies to disclose corporate resources used for political activities is arbitrary, capricious, and contrary to law;

(2) Enjoin defendant through an order requiring defendant to initiate a rulemaking proceeding mandating that public companies disclose corporate resources used for political activities;

(3) Award plaintiff its costs, expenses, and reasonable attorney's fees in this action; and

(4) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
D.C. Bar No. 298190
Campaign for Accountability
1201 Connecticut Avenue, N.W., Suite 300
Washington, D.C.  20036
(202) 780-5750
aweismann@campaignforaccountability.org

Dated:  May 13, 2015          Counsel for Plaintiff